TRAVIS *v.* NEAL.

4-5649                                     134 S. W. 2d 515

Opinion delivered November 20, 1939.

*Claude F. Cooper* and *C. M. Buck,* for appellant.

*Neill Reed,* for appellee.

BAKER, J. A suit was filed in the chancery court for the Chickasawba district of Mississippi county by Beulah Neal, appellee, against A. P. Travis. The purpose of this suit was to partition an 80-acre tract of land described as follows: East half of northwest quarter, section 14, township 14, north, range 12 east.

The allegations as to title were to the effect that Beulah Neal and her brothers, naming them, were the owners of the one-half undivided interest in the tract of land and A. P. Travis the owner of the other undivided one-half interest.

While this suit was pending, Mrs. A. P. Travis filed an intervention claiming that she had paid for this 80-acre tract of land and that she had furnished $250 to make improvements thereon; that this money had not been repaid to her. She claimed that the manner in which her money was invested in this land gave her a resulting trust in this property, and that failing to establish this trust, she had an equitable lien and was entitled to have same foreclosed.

The facts as developed show that Mr. and Mrs. Travis were living in Blytheville, Mississippi county, and that Lee Davis was living with them. Mr. and Mrs. Travis had no children and the record is devoid of any statement or explanation as to the relationship among the three of them while they lived together. Travis and his wife insist that they took Lee Davis into their home and gave him home and shelter, board and clothing, while his brothers and sister claim that Davis lived in the Travis home practically supporting them with his labor.

After a time Mr. Travis and Lee Davis became interested in the land in question. It was owned by Mr.

G. G. Hubbard and one or two brothers and sisters. Mr. Hubbard, however, had the property in charge and made the contract of sale whereby A. P. Travis and Lee Davis agreed to buy the land for $1,600. The price to be paid was divided into four installments—$400 as a cash payment, and $400 each year for the succeeding three years. Mr. and Mrs. Travis and Lee Davis went to Hubbard's place of business, at the time this contract was signed. Mr. and Mrs. Travis insist that Lee Davis was not satisfied with the contract as written, and said he would have nothing to do with it in the form in which it had been prepared. Mrs. Travis asserts that she then stated that if Lee Davis did not want to take over the property, she and Mr. Travis would become the purchasers.

Their statements in regard to this particular matter, we think, at this time amount to little, for the reason that even if it were true that Lee Davis asserted dissatisfaction in the contract he did in fact execute it at that time, and he and Mr. Travis assumed charge and possession thereafter until Lee Davis was killed. Mrs. Travis states that she, at the time, made the cash payment of $400, and that she afterwards furnished $250 to buy lumber with which to build a house on the property.

All of the notes evidencing deferred payments owing to Mr. Hubbard were signed by Mr. Travis and Lee Davis. It is stated that the contract provided that in January each year, the purchasers of the land should give to Mr. Hubbard a chattel mortgage on the crops to be grown during the year to secure each annual payment. These mortgages were executed by A. P. Travis and Lee Davis.

There is no showing what disposition was made of the crops that were produced by Travis and Davis during the time they farmed this land together. It is undisputed that they regarded themselves as partners operating under the name of ''Travis & Davis'' and that they farmed the land during the years 1935 and 1936. Lee Davis was shot, and died January, 1937, and it is highly probable that Travis farmed the land during that year.

We are also told that Lee Davis had a $2,000 life insurance policy during the period of his business opera-

tions with Mr. A. P. Travis, and made same payable to Mr. Travis as beneficiary who collected the $2,000 payable according to the policy. There is no evidence by him or Mrs. Travis of what disposition was made of this money. Perhaps, that may be immaterial at this time in consideration of the view we take of this suit.

It is now insisted that Travis and Davis borrowed this $1,850 from Mrs. Travis and there is some evidence to the effect that it was intended she should be repaid out of earnings from the land, but, we think, that the court might well have found that more likely the money was an accumulation of earnings of Travis and Davis.

Since we think it can serve no beneficial purpose to set up in minute detail all of the evidence, we content ourselves with the statement that Mrs. Travis was present when the contract for the purchase of the land was executed. We know that the contract was made with her husband and Lee Davis as the purchasers and that they had obligated themselves to pay for the land. If she furnished her own money to make the cash payment of $400, there was no note given therefor, or other contract or agreement indicating that fact. If she did thereafter, as she has positively asserted, furnish the remaining $1,200 of the purchase price, and the $250 to buy lumber, she took no kind of a written instrument from Mr. Travis or Lee Davis evidencing any obligation to pay her such sums so supplied by her. Indeed her conduct in regard to these negotiations was such as to indicate very clearly the fact that she did not regard her husband and Lee Davis as her debtors. When the notes fell due, or when she decided to pay them before maturity, she took the money and discharged these notes, accordinging to her statement, without having them indorsed, transferred, or assigned to her so that she could assert a claim against the property for security. She also claims that she paid some taxes upon the property. Her evidence and that of her husband shows that A. P. Travis had no money whatever. There is no explanation in this record of the fact that Mrs. Travis had accumulated money while Davis and her husband remained practically destitute, having only a title to the land.

The trial court dismissed the intervention of Mrs. Travis and then decreed the partition of the land as prayed for by the appellee. From this decree so adjudging the rights of the parties, Mrs. Travis appealed, insisting first upon a trust estate in the property, and, second, an equitable lien against it for the amount of money which she alleges she furnished.

The appellant cites numerous authorities defining resulting trusts and showing under what conditions such trusts may arise from the facts proven; but it is not now seriously insisted that a trust exists in this case. We devote very little time to the discussion of this proposition. No elements of a trust appear under the conditions testified to by the parties. There was no mistake, no unconscionable conduct that by any stretching of the imagination could be treated or considered as a fraud. There was no abuse of confidence or of the relations of the parties one to another. We content ourselves with the dismissal of this proposition with the statement that in every case where the courts have declared a resulting trust there had been some act of bad faith on the part of someone in over-reaching or taking advantage of another in order to profit at the other's expense; and we dare say there is not a case in all the books wherein one who has acted as openly as the parties have in their transactions and negotiations one with another as was here done wherein a resulting trust has been declared.

On the other hand, we find no evidence that would warrant the court in declaring a lien on this property. There was a lien on the property in favor of Hubbard and Mrs. Travis might well have been the beneficiary of that lien had she desired to claim it against the land at the time she now insists she furnished the money to pay the notes. She could have had Mr. Hubbard assign to her the notes, contract and mortgages, and since she was a stranger to the contract, in no sense a party to it, she could have enforced whatever lien Hubbard had against the land. She elected not to do that and, of course, in the payment for this property, according to her own testimony, she was a volunteer when she paid over the money. She paid it over for her husband and

for his partner who lived in her house. Her testimony given its strongest probative value does not even warrant the court in declaring that she paid these notes at the request of Davis and her husband and so put her in such a position that she could be subrogated by that process to Hubbard's lien.

According to the case as abstracted for us, there were no special findings of the trial court, but we think that that court might have found, and probably did so, that Mrs. Travis was the treasurer for the family, the keeper of the earnings, and that she supplied the money when the occasion or necessity arose, and on that account the land was paid for from a common fund belonging to Travis and Davis.

The necessary conclusion follows that Mrs. Travis' intervention was without merit.

The decree of the trial court was correct.

Affirmed.